**AIRPLANE SALES INTERNATIONAL CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant,**

and

**Naval Aviation Museum Foundation, Defendant–Intervenor.**

No. 99–88C.

United States Court of Federal Claims.

Aug. 20, 2003.

· Michael J. Coyne and Benjamin M. Coyle, Bacon & Wilson, P.C., Springfield, Massachusetts, for plaintiff.

Virginia G. Farrier, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.

William H.F. Wiltshire, Pensacola, Florida, for defendant-intervenor.

## OPINION AND ORDER

HODGES, Judge.

The Naval Museum contracted with the Naval Foundation for the transfer and sale of eleven C–130 aircraft hulks. Plaintiff Airplane Sales is a third-party beneficiary of the contract.[1] Airplane Sales sued for breach of contract and specific performance, claiming that the Government did not deliver parts to which plaintiff was entitled. The court denied cross-motions for summary judgment, and we scheduled a trial to clarify the contract's meaning and the parties' intent.

## BACKGROUND

This dispute arose from a transaction among plaintiff Airplane Sales, the National Museum of Naval Aviation, and the Naval Aviation Museum Foundation. The National Museum of Naval Aviation is a government entity. The Naval Aviation Museum Foundation is a private, non-profit corporation that supports the Naval Museum. The Naval Museum transfers aircraft and other surplus equipment to the Foundation, which

---

1. Neither defendant nor intervenor disputes plaintiff's third-party beneficiary status. *See Airplane Sales Int'l Corp. v. United States,* 54 Fed.Cl. 418, 421 (2002) ("[B]oth the Museum Foundation and Naval Museum were aware of the Museum Foundation's commitment to sell the C–130 hulks to Airplane Sales .... Airplane Sales was an intended third-party beneficiary of the Museum Foundation–Naval Museum contract.").

sells them to private companies. The Foundation uses the proceeds to fund restoration projects for the Museum's displays and for other educational purposes.[2] Airplane Sales agreed to purchase eleven C–130 aircraft hulks and associated parts from the Museum Foundation for $200,000. An airplane "hulk" is the fuselage or shell of the plane. The Museum released the hulks and parts to Airplane Sales but plaintiff claimed that it did not receive some parts that were listed in the aircraft logbooks. Defendant argued that plaintiff was not entitled to all the logbook parts, but only those associated with the plane that were "lying around" in or under the hulk. Plaintiff claimed that it relied on the logbooks as a direct representation of parts included in the sale because an aircraft's logbooks detail the maintenance history of its parts.

The parties filed cross-motions for summary judgment. The Government argued that language in the contract stating that parts "have been or will be removed" preserved defendant's right to strip the hulks as it wished. Plaintiff responded that the contract was ambiguous on this point and inconsistent with an "as is" disclaimer of warranty in the contract. The court agreed that the contract was ambiguous and not necessarily subject to an interpretation that would allow the Government to strip parts from the hulks after it demilitarized them. *See Airplane Sales Int'l Corp. v. United States,* 54 Fed.Cl. 418 (2002).

The court noted, "it is necessary to determine what [the hulks'] 'as is/where is' [condition] *was* at the time of the transfer, in order to assess defendant's potential liability for any allegedly withheld parts after transfer." *Id.* at 422 The court also commented that the "will-be" language allowing the planes to be stripped of equipment, conflicted with the

"as-is/where-is" language that disclaimed all warranties that might otherwise apply to these parts.[3]  *Id.* at 420.

Plaintiff's argument that aircraft parts belonging to Airplane Sales were lost or sold raised issues of material fact, the court ruled. *Id.* at 422. Trial was necessary for a court to determine (1) whether the Government had the right to remove parts after executing the contract; and (2) whether parts covered by the contract were lost or stolen. *See id.*

We concluded that the issues for trial were "exceedingly narrow." *Airplane Sales Int'l Corp. v. United States,* No. 99–88C (Fed.Cl. June 12, 2003) (order noting that the "central issue [is] whether log books identifying certain parts were included in the transaction, and whether plaintiff was entitled to rely on the information [they] contained ....."). Other issues were whether it was reasonable and customary for a salvage buyer to rely on logbooks and how to interpret contract terms that the court had found ambiguous.

## DISCUSSION

The Naval Museum transferred eleven C–130 aircraft hulks to the Museum Foundation pursuant to a program providing for exchange of historical artifacts and obsolete combat material. *See* 10 U.S.C. § 2572(a)(3)–(4). The contract between the Museum and the Foundation described the C–130 aircraft as "non-flyable hulks ... classified as scrap."

> They have been or will be stripped of their electronic, communications, and navigation equipment, all four engines, all landing gear assemblies, various panels, fixtures, doors, and other ancillary parts and components.... These are located in open storage at AMARC and are supplied in "as is" condition, following appropriate demilitarization.

**2.** Secretaries of the Armed Services are authorized to transfer obsolete aircraft and parts to non-profit museums and other qualified entities for display:

> The Secretary concerned may lend or give items ... to ... [a] museum, historical society, or historical institution of a State or a foreign nation or a nonprofit military aviation heritage foundation or association incorporated in a State [or][a]n incorporated museum or memo-

rial that is operated and maintained for educational purposes only and the charter of which denies it the right to operate for profit. *10 U.S.C. § 2572(a)(3)–(4).*

**3.** The contract stated that the planes "have been or will be stripped of their ... equipment .... [They] are located in open storage at AMARC and are supplied in 'as is' condition, following appropriate demilitarization." (emphasis added).

The contract also stated that "the Government does not warrant the fitness of the equipment transferred to the Contractor ... for any purpose and the equipment is offered only as is/where is with no guarantee stated or implied."

A Release Letter from the Naval Museum to the Foundation describes the subject matter of plaintiff's bargain:

loose aircraft parts and components in and around the aircraft hulks and identified as belonging to the specific aircraft hulks set forth in their respective logbooks, not includ[ing] any parts or components belonging to other aircraft nor does it include parts identified for reclamation, demilitarization, or other U.S. Government requirements. This language is clear, and it is consistent with trial testimony. Plaintiff was entitled to parts and components that were "in and around" the hulks, mostly lying on the ground nearby, if they could be identified as belonging to one of the eleven hulks. Plaintiff did not have rights to parts that belonged to other aircraft, even if they were lying beneath a hulk that was included in the contract. The logbooks associated the salvaged parts with the planes they were removed from. Plaintiff argued that by purchasing the logbooks, it purchased the parts listed in the logbooks. The only exception was parts that were excluded by contract or "lined out in the logbooks."[4] Defendant disputed the notion that the logbooks provided an inventory of parts that accompanied a particular hulk. Moreover, the Government disclaimed all warranties of fitness of the hulks and their associated parts. If the Museum sold the logbooks along with the hulks and parts, it sold them "as is." Plaintiff could not rely on the logbooks as an inventory because defendant disclaimed their accuracy and completeness. Captain Hawkins was sec-

retary-treasurer of the Naval Foundation. He testified that language in the Release Letter and the contract limited the transfer to parts in and around the hulk if the logbooks identified them as having come from one of the eleven C–130 aircraft. Plaintiff was not entitled to parts belonging to hulks that were not among those aircraft. Captain Hawkins and Mr. Swetman, former Director of the Naval Aviation Supply Office at the Base, testified credibly to these procedures.[5] They emphasized an additional requirement: "We have to be able to find them." They noted that parts became separated from their aircraft when workers moved the hulks but did not necessarily move the parts associated with them.[6] Plaintiff produced no evidence that defendant purposely hid or substituted parts.

Airplane Sales offered its experience with a prior salvage transaction as evidence that logbooks represented parts that were included in the contract. That transaction was not comparable to the contract in this case. Plaintiff contracted with the Naval Museum then, not the Foundation. It purchased flyable aircraft then; these were scrap. Safety and maintenance considerations require that logbooks associated with flyable planes be current and reliable. The Navy does not maintain logbooks for non-flyable planes.

Plaintiff essentially argued that the logbooks expanded the number of parts to which Airplane Sales was entitled by listing parts that were not in or around the hulks. In fact, the logbooks restricted the parts available for transfer by enabling the Navy to identify the origin of parts that were scattered among the aircraft. The language of the Release Letter and other documents in evidence addressing the scope of this contract are clear and consistent with testimony that we found credible.

4. One of plaintiff's witnesses explained that the concept of "lining out" parts was a misnomer because each part had its own logbook section showing its history of maintenance and repair.

5. Plaintiff attempted to discredit Captain Hawkins' testimony with a declaration that he had submitted earlier. His testimony was credible and consistent with the declaration, however.

6. Quick Engine Change Kits were among the most valuable parts plaintiff received. Workers misplaced two kits in such a moving process. The Navy discovered them later and delivered them to Airplane Sales.

## CONCLUSION

Plaintiff did not produce credible evidence that the Navy withheld or disposed of parts belonging to Airplane Sales before, during, or after it signed the contract or received title to the hulks. Such allegations were not serious issues during trial. Use of the warranty and delivery terms "As Is" and "Where Is" did not make this contract ambiguous. That language disclaimed any warranty that the parts were fit for a particular purpose or that the logbooks were reliable, and it emphasized that the buyer would pay to remove the hulks and parts from the base. Plaintiff could not reasonably have relied on logbooks for an inventory of parts to which it was entitled. Logbooks are maintained carefully for active planes, according to rigid standards for maintenance and safety. Once an aircraft has been "stricken" and delivered to a storage or salvage facility, regulations do not require that the logbooks be maintained.

Airplane Sales paid $200,000 for eleven C–130 hulks stored in a salvage yard. The Navy lined up hulks by the hundreds and parts are scattered over the ground. They are exposed to the elements. The Government intended to sell hulks and related parts that had little value other than as scrap in most cases, and Airplane Sales intended to buy those hulks and parts. Plaintiff's scrap-value offer supports this commonsense conclusion. Testimony and other evidence offered during the trial confirmed it.

The Clerk of Court will dismiss plaintiff's complaint. Costs to defendant.